## Commonwealth *v.* Jones, Appellant.

300

Argued April 17, 1972.   Before Jones, C. J., Eagen, O'Brien, Roberts, Pomeroy and Manderino, JJ.

*Harold L. Randolph,* with him *Nix & Randolph,* for appellant.

*Ralph B. D'Iorio,* Assistant District Attorney, with him *Anna Iwachiw Vadino,* Assistant District Attorney, and *Stephen J. McEwen, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, May 4, 1973:

About 8:30 p.m. on April 7, 1969, three young men attempted to rob John Courtney and Joseph O'Brien as they walked along a public street in Media, Delaware County, Pennsylvania. Courtney was shot by the felons and suffered wounds which caused his death on May 18th. O'Brien was stabbed and shot but survived.

As a result of information uncovered by the police, Ronald Jones, the appellant herein, Alan Pierce and Wesley Groce, three young black males, were arrested for the crimes. After a jury trial Jones was convicted of murder in the first degree, robbery, aggravated assault and battery, assault with intent to kill and conspiracy.[1] On the murder conviction he was sentenced

---

[1] In separate jury trials Pierce and Groce were convicted of the same criminal charges. Pierce and Groce were subsequently

to life imprisonment as the jury's verdict directed.[2] From this judgment the instant appeal was filed.

It is asserted certain errors occurred in the prosecution process which require a new trial. These claims of error will be discussed seriatim.[3]

At trial, a .38 calibre revolver, which expert testimony established fired a bullet recovered from Courtney's body after the occurrence, was introduced in evidence. It is claimed the trial court erred in refusing a motion to suppress this evidence, because it was the product of a search based on an illegally issued warrant. The pertinent facts in the record are these.

During the investigation of the crimes, the Chief of Police of Media, Thomas Bruton, questioned three boys, Roger Carter, James Carter and David Willard Day, who informed him they passed the crime site in an automobile at or about the time of the occurrence involved and someone yelled, "Hey Roger"; that subsequently they talked with Pierce who said he, Groce and Jones committed the attempted robbery; that he (Pierce) fired the shots which injured Courtney and O'Brien and he was the one who yelled "Hey Roger" to Roger Carter. A search warrant was then obtained for the residence of an uncle of Jones (with whom he resided) and the revolver was uncovered and seized in the search.

---

awarded new trials. See *Commonwealth v. Pierce*, 451 Pa. 190, 303 A. 2d 209 (1973), and *Commonwealth v. Groce*, 452 Pa. 15, 303 A. 2d 917 (1973).

[2] Jones was also sentenced to prison for substantial terms on two other indictments, but appeals were not entered from these judgments.

[3] Testifying in his own defense at trial, Jones admitted going from Chester to Media on the night involved with Pierce and Groce to rob someone. He also admitted supplying the gun used in the commission of the crimes and being a very short distance from the scene when the crimes were committed. However, he said he withdrew from the conspiracy before the crimes occurred.

In support of the issuance of the search warrant, the Chief of Police of Media, Thomas Bruton, submitted a written affidavit to the magistrate which stated Jones was a participant in the holdup and assault of Courtney and O'Brien. It also included a detailed description of the premises to be searched, plus the following: "He [Bruton] has reason to believe and which he had relied upon making this affidavit, that Ronald Jones lives at the said address and he was a participant in the foregoing holdup in which a gun was used according to the witnesses as well as other testimony given by Chief Bruton and Rocco P. Urella." The foregoing affidavit did not meet constitutional standards (*Aguilar v. Texas,* 378 U.S. 108, 84 S. Ct. 1509 (1964)), however, at the suppression hearing it was established that before the warrant issued, Chief of Police Bruton, while under oath, also supplied the magistrate with the background of the crimes and also told him of the information he received from Roger Carter, James Carter and David Willard Day, all of whom he knew for years and considered "honest." The officer also gave the magistrate a description of the three felons as supplied by witnesses who saw them fleeing from the scene.

The sufficiency of the combined oral and written information supplied to the magistrate to sustain a finding of probable cause is not challenged.[4] Jones'

---

[4] The standard for a determination of whether a warrant is valid can be found in our recent case of *Commonwealth v. Matthews,* 446 Pa. 65, 285 A. 2d 510 (1971), wherein we stated: "The appropriate benchmark for a determination of whether a search and seizure warrant is valid is Aguilar v. Texas, supra, as explicated in Spinelli v. United States, supra. In these two cases the United States Supreme Court developed the following two-pronged test for ascertaining the validity of a warrant: 'First, the application failed to set forth any of the "underlying circumstances" necessary to enable the magistrate independently to judge of the validity of the informant's conclusions . . . Second, the affiant-officers did not

*sole* contention is that the magistrate erred in considering the oral testimony in determining if probable cause existed. We have reviewed this issue in *Commonwealth v. Milliken,* 450 Pa. 310, 300 A. 2d 78 (1973), and what we said therein controls here. This assignment of error is, therefore, overruled.

The next claim of error maintains Jones' constitutional right to due process was violated at trial by the admission in evidence of a written incriminating statement he gave the police following his arrest. This contention is basically premised on the fact that at the time Jones was eighteen years of age and without the assistance of legal counsel.

This court has previously decided a minor who has attained the age of at least fifteen years may knowingly, intelligently, and voluntarily waive his right to counsel without having the assistance of counsel and if a valid waiver occurs a subsequent confession given in the absence of counsel is not constitutionally proscribed as trial evidence. See generally *Commonwealth v. Moses,* 446 Pa. 350, 287 A. 2d 131 (1971) ; *Commonwealth v. Darden,* 441 Pa. 41, 271 A. 2d 257 (1970). It is clear, therefore, that if an eighteen-year-old knowingly and intelligently makes the decision to answer the questions of the police without the assistance of counsel, the police are not under a duty to provide him with counsel contrary to his wishes.

In the present case the record reveals Jones was warned of his constitutional rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), at least three times before he made the challenged statement and he knowingly, intelligently, and voluntarily waived his right to have counsel present during the

attempt to support their claim that their informant was "credible" or his information "reliable." ' 393 U.S. 413, 89 S. Ct. at 587." Id. at 70, 285 A. 2d at 512.

police questioning. The uncontradicted testimony of the police officers shows Jones understood each of the warnings and readily manifested a willingness to cooperate and answer the questions of the police. There were no threats, promises or tricks employed by the authorities, and the two periods of interrogation were relatively short in duration. Moreover, Jones was well fed during the time of his custody and he was not in a state of fatigue. Furthermore, his uncle (his legal guardian) William Jones, was present during the time Jones was given the "Miranda" warnings and throughout the interrogation period. Another member of his family, a Mrs. Bennett, an aunt, was also present during the interrogation. The testimony of the police establishes that not only was the uncle present during the reading of the warnings, but the police also explained Jones' rights to his uncle. On this record, it is clear this assignment of error is devoid of merit.

As a corollary to the contention the statement was inadmissible as evidence at trial, Jones asserts the police never informed him he "was suspected of murder." Under the circumstances, this did not render the statement inadmissible. For an understanding of the basis of our ruling a brief factual summary is necessary. The shooting of the victim Courtney occurred on April 7, 1969, but the man did not die until one month and eleven days later on May 18, 1969. Jones was taken into custody on April 13, 1969, and his confession was completed in the early morning hours of April 14, 1969. Thus, at the time of the confession the victim of the murder was alive, and apparently recovering from his wounds. When Jones was arrested and before he confessed, he was informed he was suspected of assault with intent to kill, aggravated assault and battery, robbery and conspiracy. Hence, when he was questioned he was told of the crimes he was suspected of commit-

ting or then charged with. Under these facts, since the victims of the crimes were alive and recovering from their wounds, it is unreasonable to say the police should have also told Jones he could possibly be charged with murder—for the simple reason he was not suspected of murder at the time he confessed.

Jones next challenges the sufficiency of the evidence to sustain his conviction of murder in the first degree. The foundation of this challenge rests on the fact that there was no positive identification of appellant as one of the felons. As support for his position Jones relies on our recent decision in *Commonwealth v. Crews*, 436 Pa. 346, 260 A. 2d 771 (1970). In *Crews* the only evidence to connect the defendant with the crime was his proximity to the location of the crime, his association with another defendant, and his possession of a sweater which was similar to the one worn by one of the perpetrators of the murder. In the case at bar, the Commonwealth produced much more substantive evidence to connect Jones with the crimes and after a thorough review of the record, we have no doubt the evidence was ample to support the conviction. Herein, the Commonwealth brought forth O'Brien, one of the victims of the crimes and, while he was not able to positively identify Jones, he said Jones did match the general description of one of the felons; but more importantly he recounted in depth the events leading up to the fatal shooting. The Commonwealth also introduced the constitutionally valid confession of appellant. The confession, which contained a recitation of how the crimes occurred, also detailed Jones' participation, and was exactly the same in detail as the trial testimony of O'Brien. In the confession Jones told how he supplied the murder weapon, and how he concealed it after the crimes were committed. Moreover, evidence was introduced to show Jones was taken to the crime site where

he re-enacted the crimes in detail. On the witness stand Jones admitted supplying the gun and concealing it after the crimes and being near the scene of the crimes in the company of the known killer, but he maintained he attempted and did withdraw from the conspiracy a few seconds before the robbery-murder took place. However, there was ample evidence supplied by the Commonwealth which rendered Jones' testimony as to withdrawal and nonparticipation unbelievable. The witness O'Brien testified there were only three black men on the street and all three took part in the crimes, and in his confession Jones stated that although he wanted to withdraw from the conspiracy he ultimately took part in the robbery-murder because he felt it was too late for him to get out.

On the basis of the evidence produced by the Commonwealth, the jury was warranted in returning a verdict of guilty of murder in the first degree.

Appellant next challenges the trial court's denial of his motion for a change of venue. The foundation of appellant's application for a change of venue rested on a series of newspaper articles published in a local newspaper which carried accounts of the crimes, the police investigation, and certain pretrial proceedings. Appellant alleges the publicity was so "inherently prejudicial" that it was impossible for him to receive a fair trial in Delaware County. The Commonwealth counterargued the pretrial publicity was not of the nature which would deprive appellant of due process of law. We have personally reviewed the articles in question and rule it was not an abuse of discretion for the trial court to deny the motion based on the evidence before it.

Appellant apparently relies on the case of *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507 (1966), wherein the United States Supreme Court ruled the media

publicity attending the Sheppard trial barred Sheppard from receiving a fair trial by an impartial jury.[5] There is no analogy in the quality of the publications in the instant case to that involved in the *Sheppard* case.

In the present case, the articles, as they relate to Jones, were factual and routine and the majority of the accounts did not mention Jones by name. It was never once stated in the articles that Jones inflicted the wounds on the victims, and his complicity in the crimes is truly unclear from a reading of the publications. The publicity in the instant case does not parallel in quality that which appeared in *Commonwealth v. Pierce*, 451 Pa. 190, 303 A. 2d 209 (1973), and there was no meaningful violation of the standards therein set forth. Under the circumstances, we rule the pretrial publicity was not of the nature which presumptively denied appellant a fair trial, and since Jones presented no other evidence to substantiate his claim, we rule this assignment of error to be without merit.

Moreover, we are mindful of the fact that appellant was given ample opportunity on voir dire examination to question each prospective juror to ascertain if he or she could render an impartial verdict.[6] We have in-

---

[5] See also *Estes v. Texas*, 381 U.S. 532, 85 S. Ct. 1628 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417 (1963). Cf. *Commonwealth v. Stewart*, 449 Pa. 50, 295 A. 2d 303 (1972).

[6] In *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639 (1961), the United States Supreme Court, after reciting the underlying guarantees of the jury system stated:

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more is sufficient to rebut the

dependently reviewed the entire voir dire examination and are convinced Jones was tried before a fair and impartial jury. There is absolutely no indication that the jurors had opinions as to guilt or innocence which would raise the presumption of partiality. We rule Jones' trial was conducted in accordance with the fundamental principles of due process of law.

Finally, appellant argues the trial court improperly denied his challenge to the array of the jury. Prior to trial, appellant, a black man, filed a petition to challenge the array of the jury panel which apparently was predominantly white. During a pretrial proceed-

---

presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Spies v. People of State of Illinois, 123 U.S. 131, 8 S. Ct. 22, 31 L. Ed. 80; Holt v. United States, 218 U.S. 245, 31 S. Ct. 2, 54 L. Ed. 1021; Reynolds v. United States, supra.

"The adoption of such a rule, however, 'cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.' Lisenba v. People of State of California, 314 U.S. 219, 236, 62 S. Ct. 280, 290, 86 L. Ed. 166. As stated in Reynolds, the test is 'whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality. The question thus presented is one of mixed law and fact . . . .' At page 156 of 98 U.S., 'The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside . . . . If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed.' At page 157 of 98 U.S. As was stated in Brown v. Allen, 344 U.S. 443, 507, 73 S. Ct. 397, 446, 97 L. Ed. 469, the 'so called mixed question or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.' It was, therefore, the duty of the Court of Appeals to independently evaluate the *voir dire* testimony of the impaneled jurors." Id. at 722-23, 81 S. Ct. at 1642-43.

ing, counsel requested a hearing be held so he would have an opportunity to establish his claim, and his request was summarily denied by the court.

The legal basis for a challenge to a jury because of racial discrimination finds its foundation in the Equal Protection Clause of the Fourteenth Amendment, and the long line of cases from the United States Supreme Court which have enumerated the protections contained within the Constitution. As long ago as 1880 in *Strauder v. West Virginia,* 100 U.S. 303 (1879), the Supreme Court in espousing constitutional theory as it relates to racially founded challenges to the selection of a jury stated: "The right to trial by jury is guaranteed to every citizen of . . . [the state] by the Constitution of that State, and the constitution of juries is a very essential part of the protection such a mode of trial is intended to secure. The very idea of a jury is a body of men [and women] composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds. Blackstone, in his Commentaries, says, 'The right of trial by jury, or the country, is a trial by the peers of every Englishman, and is the grand bulwark of his liberties, and is secured to him by the Great Charter.' It is also guarded by statutory enactments intended to make impossible what Mr. Bentham called 'packing juries.' It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy. . . . The framers of the constitutional amendment must have known full well the existence of such prejudice and its likelihood to continue against the manumitted slaves and their race, and

that knowledge was doubtless a motive that led to the amendment. By their manumission and citizenship the colored race became entitled to the equal protection of the laws of the States in which they resided; and the apprehension that through prejudice they might be denied that equal protection, that is, that there might be discrimination against them, was the inducement to bestow upon the national government the power to enforce the provisions that no State shall deny to them the equal protection of the laws." Id. at 308-09. The theories underlying the constitutional protection have been developed and refined up until as recently as the last term of the United States Supreme Court when it decided the case of *Alexander v. Louisiana*, 405 U.S. 625, 92 S. Ct. 1221 (1972). The primary goal of all the cases which fall within this line was concisely stated in *Cassell v. Texas*, 339 U.S. 282, 286, 70 S. Ct. 629, 631 (1950), wherein it was stated: "Jurymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race." Certain basic concepts have developed which supply the guidelines for reaching the ultimate goal.

It is clear that a defendant has no right to demand that members of his race be on the jury which tries him, however, he does have a right to require a state not to deliberately and systematically exclude members of his race from the jury panels and from the juries ultimately drawn from those panels,[7] consequently, he must prove systematic exclusion, thereby demonstrating a violation of the Equal Protection Clause.[8]

---

[7] See generally *Alexander v. Louisiana*, supra; *Swain v. Alabama*, 380 U.S. 202, 85 S. Ct. 824 (1965) ; *Cassell v. Texas*, supra; *Akins v. Texas*, 325 U.S. 398, 65 S. Ct. 1276 (1945) ; *Gibson v. Mississippi*, 162 U.S. 565, 16 S. Ct. 904 (1896) ; *Ex parte Virginia*, 100 U.S. 339 (1879).

[8] As was aptly stated in *Smith v. Texas*, 311 U.S. 128, 61 S. Ct. 164 (1940) : "For racial discrimination to result in the exclusion

Moreover, a defendant may not demand proportionate numbers of his race on the jury which tries him, or on the panel from which the jury is selected,[9] but he does have a right to a jury drawn from a panel which represents a cross-section of the community.[10] The defendant has the initial burden of demonstrating a prima facie case of discrimination, then the burden shifts to the Commonwealth to rebut the evidence,[11] if the Commonwealth fails, the selection system does not meet the requisite constitutional standards and the defendant is entitled to another jury, selected under a system which complies with the constitutional mandate.

The difficulty with the record before us is that it does not with *any* degree of clarity provide us with the factual information to consider in connection with the constitutional principles. Since the court denied appellant a hearing, we are not provided with any type of statistics which show the population make-up of Delaware County, nor are we provided with any factual background which would show systematic exclusion. We are not even aware of the exact make-up of the jury panel in the instant case. The record is absolutely silent as to the factual data necessary for a proper determination of such a fundamental issue.

Consequently, the specific issue to be resolved is simply whether the trial court properly denied appellant's request for a hearing. Apparently, appellant

from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." Id. at 130, 61 S. Ct. at 165.

[9] See generally *Swain v. Alabama* and *Cassell v. Texas*, supra.

[10] See generally *Carter v. Jury Commission of Greene County*, 396 U.S. 320, 90 S. Ct. 518 (1970) ; *Whitus v. Georgia*, 385 U.S. 545, 87 S. Ct. 643 (1967) ; *Smith v. Texas*, supra n. 8; *Norris v. Alabama*, 294 U.S. 587, 55 S. Ct. 579 (1935).

[11] Cf. *Turner v. Fouche*, 396 U.S. 346, 90 S. Ct. 532 (1970) ; *Eubanks v. Louisiana*, 356 U.S. 584, 78 S. Ct. 970 (1958).

moved to challenge the array on the grounds that there were few black men or women on the panel from which he was to choose the trial jury, and this had happened in other cases, and he was of the belief this was the result of systematic exclusion. However, the record only discloses the allegation (the actual total foundation of the challenge is truly unclear) ; there is no explanation of the challenge and the Commonwealth did not come forth with any type of evidence. In short, the extent of what we have to work with is an allegation of a violation of the Equal Protection Clause, and a summary denial by the court based on its belief that the jury selection system in Delaware County met all the requisite standards (which it may) and there was absolutely no need for any type of hearing. With this conclusion, we cannot agree. When a criminal defendant raises such a fundamental issue, he should at least be allowed to clearly state his grounds for challenge on the record, and if his grounds have any factual semblance of validity he should be given an opportunity to state and prove his case at a pretrial hearing,where he can more fully establish his claim through the use of the appropriate factual data. The jury is truly a fundamental part of the judicial structure—an appendage of the court—the body of individuals who stand between the accused and the accusers, who have the unenviable task of determining guilt and innocence. Our laws insure the accused a fair and impartial jury—one chosen from a cross section of the community, and every effort must be afforded the accused to insure the body of citizens who sit in judgment must be selected in accordance with the Equal Protection Clause of the Fourteenth Amendment. If a defendant has grounds upon which he can challenge the system of selecting jurors, he must be given an opportunity to prove it.

The Commonwealth vigorously asserts in its brief that we should not remand this case for a hearing because the appellant did not meet the procedural standards as set forth in Rule 1104 of the Pennsylvania Rules of Criminal Procedure.[12] A review of the record clearly reveals that appellant's counsel did not comply with this Rule and under normal circumstances, appellant would thereby be precluded from requesting a hearing or complaining about the denial of a hearing. See *Commonwealth v. Butler*, 448 Pa. 128, 291 A. 2d 89 (1972);[13] *Commonwealth v. Werner*, 444 Pa. 458,

---

[12] Rule 1104 states:

"Lists of Trial Jurors and Challenge to the Array.

"(a) The officials designated by law to select persons for jury service shall prepare, publish and post such lists of the names of persons to serve as jurors as provided by law.

"(b) Unless opportunity did not exist prior thereto, a challenge to the array shall be made not later than five days before the first day of the week the case is listed for trial of criminal cases for which the jurors have been summoned and not thereafter, and shall be in writing, specifying the facts constituting the ground for the challenge.

"(c) A challenge to the array may be made only on the ground that the jurors were not selected, drawn or summoned substantially in accordance with law."

[13] In *Butler*, Mr. Justice O'BRIEN stated the following with respect to what information is necessary in the petition: "However, the characteristics of one particular panel are not the type of facts which constitute grounds for a challenge. Rather, since the challenge must be to the selection procedures themselves, and not to the composition of a particular panel, the facts must provide evidence indicating either that the procedures as designed or implemented are likely to result in juries unrepresentative of a cross section of the community, or that the procedures have, in fact, continuously failed to represent certain identifiable population groups over a period of time. Such facts are as available before trial as after the jury has been selected. These are facts concerning the proportion of the county's population represented by various specified population groups, here negroes and people under thirty-five, the frequency with which persons from these groups appear on the jury lists, and the methods by which these lists are selected. A

282 A. 2d 258 (1971). However, the record also reveals the trial court did not deny the hearing on procedural grounds, but rather on substantive grounds, i.e., its belief, through experience, that the jury selection system in Delaware County was constitutionally valid. Under the circumstances, appellant is not procedurally barred from challenging the denial, since the denial rested on a substantive foundation.

Neither defense counsel nor the trial court is free from blame for the state of this record or the disposition of this claim. Defense counsel was apparently ill prepared to present this claim, and if he were prepared, the summary action by the court stopped him from properly pursuing it. Under the circumstances, we will remand the case to the trial court for further proceedings in which appellant is to be given an opportunity to properly present and establish his claim.

We will retain jurisdiction of the appeal until the trial court files a report of its findings and conclusions.

It is so ordered.

Mr. Justice NIX took no part in the consideration or decision of this case.

———

DISSENTING OPINION BY MR. JUSTICE POMEROY:

I continue to adhere to my objection to the deplorable practice of reconstructing by oral testimony at a suppression hearing a search warrant which on its face is invalid. Such attempts to supply, ex post facto, the essential Fourth Amendment ingredient of probable

———

hearing to determine whether the facts presented constitute sufficient grounds for a successful challenge to the jury selection procedure is by necessity a complex event. If a defendant wishes to delay trial for the holding of such a hearing, Rule 1104(b) requires him to make his request, alleging sufficient grounds therefor, before trial so that prospective jurors and witnesses are not unnecessarily inconvenienced." Id. at 133, 291 A. 2d at 91-92.

cause by police testimony as to what was stated orally to the issuing authority at some remote prior date are, in my judgment, violative of the federal constitution. See my dissenting opinion in *Commonwealth v. Milliken*, 450 Pa. 310, 300 A. 2d 78, 84 (1973). The fact that we have now by procedural rule[1] prospectively put an end to this practice is no answer to the constitutional challenge made by this appellant to this 1969 search warrant.

The product of the search in this case was the murder weapon. Notwithstanding the strong evidence of guilt shown by this record (including the confession and identification testimony), I am unable to conclude that the introduction into evidence of such an important exhibit as the revolver was constitutionally harmless error. I therefore believe a new trial should be ordered. For this reason I am obliged to dissent.

Mr. Justice MANDERINO joins in this dissenting opinion.

---

[1] Rule 2003 of the Pennsylvania Rules of Criminal Procedure, adopted by this Court on March 28, 1973.