**COMMONWEALTH of Pennsylvania**

v.

**Richard Hassain ESTES, A/K/A Hassaim Estes, Appellant**

Superior Court of Pennsylvania.

Argued March 17, 2004.
Filed May 28, 2004.

John L. Elash, Pittsburgh, for appellant.

Kevin F. McCarthy, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before: KLEIN, BENDER and JOHNSON, JJ.

BENDER, J.:

¶ 1 Richard Hassain Estes (Appellant), a/k/a Hassaim Estes, appeals from the

judgment of sentence imposed as a result of a conviction, before a jury, of third degree murder.[1] Appellant raises three issues on appeal, one involving the jury selection system and two involving the effectiveness of trial counsel. After argument, review of the briefs and record, we affirm.

¶ 2 Appellant raises two issues alleging ineffective assistance of trial counsel. While there are certain circumstances when allegations of ineffectiveness of trial counsel can be considered on direct appeal, see Commonwealth v. Bomar, 573 Pa. 426, 826 A.2d 831 (2003), this is not such a case. Here, the claims of ineffectiveness of trial counsel have not been developed on the record. Testimony has not been taken and, accordingly, neither we nor the trial court has heard from trial counsel concerning these claims of ineffective assistance of counsel. Accordingly, the general rule announced in Commonwealth v. Grant, 572 Pa. 48, 813 A.2d 726 (2002), should be followed and Appellant's claims of ineffective assistance of trial counsel must wait until collateral review.

¶ 3 Appellant further raises an issue involving the jury selection system which is set forth as follows:

MR. ESTES WAS DENIED A FAIR TRIAL BY A JURY SELECTION SYSTEM WHICH, BASED UPON THE METHODS USED TO SELECT JURORS, RESULTED IN A JURY POOL THAT FAILED TO ADEQUATELY REPRESENT THE RACIAL, GENDER AND AGE COMPOSITION OF ALLEGHENY COUNTY.

Appellant's Brief at 13. Appellant claims that methods used by Allegheny County to create jury pools systematically excludes non-caucasian individuals, males, and persons between the ages of 25 and 45, so as to create a disproportionate population of middle-aged to elderly caucasian females in the jury pool. The premise implied in Appellant's challenge is that juries comprised of high concentrations of middle aged or elderly Caucasian females are more prone to convict African–American male defendants. Due to our disposition of this issue, we do not address the extremely subtle and difficult question of what type of juror favors a certain type of defendant. As any trial lawyer knows these questions lack firm answers.

¶ 4 Appellant cites Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), for the proposition that the Sixth Amendment to the United States Constitution provides for a trial by a jury of one's peers drawn from a source fairly representative of the community and Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), for the standard used to establish a prima facie violation of the fair cross section requirement. While Appellant shows a persistent underrepresentation of certain groups in Allegheny County jury pools, he fails to address requirements set forth in Pennsylvania Supreme Court cases which mandate showing more than evidence that certain groups are underrepresented prior to finding discriminatory jury pooling practices.

¶ 5 Our Supreme Court has recently summarized the requirements for a challenge to the array of prospective jurors on the ground that such array does not reflect a fair cross section of the community. In the case of Commonwealth v. Johnson, 576 Pa. 23, 838 A.2d 663 (2003), the court stated:

The Commonwealth notes that Appellant does not have the right to demand that specific numbers of minorities sit on the jury panel which judges him. See

1. 18 Pa.C.S. § 2501.

*Commonwealth v. Jones,* 452 Pa. 299, 304 A.2d 684 (1973); *Commonwealth v. Craver,* 547 Pa. 17, 27–28, 688 A.2d 691, 696 (1997) (" 'Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not *systematically* exclude distinctive groups in the community and thereby fail to be *reasonably* representative thereof.' " (quoting *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975) (emphasis in original))).

To establish a *prima facie* violation of the requirement that a jury array fairly represent the community, Johnson must show that:

(1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation of the number of such people in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. "Systematic" means caused by or inherent in the system by which juries were selected. *Craver,* 547 Pa. at 28, 688 A.2d at 696 (citing *Duren v. Missouri,* 439 U.S. 357, 364, 366–67, 99 S.Ct. 664, 668–70, 58 L.Ed.2d 579 (1979)). Proof is required of an actual discriminatory practice in the jury selection process, not merely underrepresentation of one particular group. *See id.* at 27–28, 688 A.2d at 696. The defendant bears the initial burden of presenting *prima facie* evidence of discrimination in the jury selection process. *See Jones,* 452 Pa. at 312, 304 A.2d at 692.

This Court has rejected various criminal defendant's attacks, on the basis that African–Americans were underrepresented, to the racial composition of a jury panel drawn from voter registrations lists. *See Commonwealth v. Bridges,* 563 Pa. 1, 18, 757 A.2d 859, 868 (2000); *Commonwealth v. Henry,* 524 Pa. 135, 144, 569 A.2d 929, 933 (1990). More recently, the reasoning and holdings of those cases have been extended to approve the usage of driver's license lists for purposes of jury selection. *See Commonwealth v. Johnson,* 572 Pa. 283, 305, 815 A.2d 563, 575 (2002) (plurality) ("Absent some showing that driver's license selection procedures are inherently biased, [the defendant] has failed to distinguish jury pool lists derived from voter registration records from those derived from driver's license registration lists"); *accord Commonwealth v. Cameron,* 445 Pa.Super. 165, 175–76, 664 A.2d 1364, 1369 (1995).

*Id.* at 682. (footnote omitted).

¶ 6 In an effort to establish a pattern of discriminatory practice in constructing jury pools, Appellant offered prior to trial, the testimony of John F. Karns, Ph.D., to show that certain groups are underrepresented in the Allegheny County jury pool. The trial court in its opinion summarized the testimony of Dr. Karns and explained the actions the trial court took to help Appellant with the problem of underrepresentation:

Prior to trial, the defense called Dr. John F. Karns, a respected lawyer and sociologist on the faculty of the University of Pittsburgh. Dr. Karns testified that he engaged the firm of Gentile–Meinert and Associates to collect demographic data concerning the persons called for jury duty in the Criminal Division of this court during the months of May through September 2001. He compared that data to the reports of the

U.S. Census Bureau for the year 2000. He concluded that the African–American population of Allegheny County is 11.19 percent, but only 4.7 percent of the jury pool is African–American. He found less significant deviations with respect to gender and age. Finally, Dr. Karns pointed out that the jury pool excludes those persons between the ages of zero and 18 years of age whereas the census data includes those persons. For this reason, the court found that the study, while troubling, was incomplete.

The court denied the defendant's motion to dismiss the charges against him, and his motion to postpone the trial until the system can be corrected. However, at the defendant's request, the court directed that all African–Americans present for jury service be interviewed for service on his jury. As a result of the court's intervention, one African–American served as a principal juror on the defendant's jury and another served as an alternate.

Trial Court Opinion, 9/18/02, at 3.

¶ 7 While it is true that Dr. Karn's testimony shows underrepresentation of certain groups, such underrepresentation alone does not show "an actual discriminatory practice in the jury selection process...." *Johnson*, 838 A.2d at 682. Appellant offered no evidence of a calculated discriminatory practice. Appellant in fact offered no testimony whatsoever concerning the Allegheny County jury selection process. He further fails to make an argument as to what discriminatory practice might be causing the systematic exclusion. The mere showing of underrepresentation, absent an actual discriminatory practice in the jury selection process, causes Appellant's constitutional claim to fail. *Johnson, supra.*

¶ 8 The above conclusion is compelled by the law set forth by our Supreme Court in

*Johnson, supra,* and other cases dealing with this issue. We note, as did the trial court that underrepresentation of African–Americans in our jury pools is a serious problem which must be corrected. We are not unmindful of steps that are being taken in Allegheny County to attempt to correct this problem.

¶ 9 Joseph M. James, President Judge of the Court of Common Pleas of Allegheny County, has this month issued the following order:

### ORDER OF COURT

AND NOW, to-wit, this 1st day of March, 2004, it appearing to the court that:

1. The pool of qualified jurors in Allegheny County is currently 13,498;

2. Despite direction by the court, the Jury Commission has been unable to meet the requirements established by the court that 150,000 questionnaires be mailed to randomly selected citizens of Allegheny County to comprise the 2004 qualified juror pool;

3. As of the date of the Order, just 35,000 questionnaires of the total 150,-000 have been mailed;

4. Despite direct instruction to mail follow-up questionnaires to potential jurors who have failed to return the initial questionnaire, none have been mailed in the year 2004;

5. The failure to adequately increase the size of the pool and to aggressively follow-up on those failing to respond to questionnaires may, in the future, jeopardize the randomness of the selection process and the racial diversity required in proportion to the existing population; and;

6. If no remedial action is taken, the future pool of qualified jurors may

exclude identifiable groups of the minority population.

¶ 10 Therefore, it is ORDERED that:

1. The Jury Commission is hereby directed to mail a total of 65,000 questionnaires on or before June 30, 2004;

2. The District Court Administrator of Allegheny County is hereby directed to outsource the mailing of 50,000 questionnaires on or before March 31, 2004;

3. In addition to the 150,000 questionnaires that will be sent to persons selected randomly from lists of licensed drivers and qualified electors, the District Court Administrator is hereby directed to complete a supplemental draw of jurors amounting to 10% or 15,000 citizens, to be drawn at random from Allegheny County Municipalities and City of Pittsburgh Wards that contain a minority population of 10.8% or larger. This shall be completed on or before March 31, 2004;

4. The Jury Commission is hereby directed to immediately initiate the procedures adopted by the court to respond to all potential jurors that fail to answer the request to complete the questionnaire;

5. Beginning immediately, the District Court Administrator is hereby directed to supplement each daily jury array by an additional 10% from those Allegheny County Municipalities and City of Pittsburgh Wards that contain a minority population of 10.8% or larger. Each additional draw shall be done at random from the pool of qualified jurors; and

6. At the end of this six-month trial period, the court will analyze the resulting composition of jury pools.

¶ 11 Given the above Order and other steps being taken to improve racial diversity of jury pools, it is hoped that the current issues being raised by Appellant will not be a problem in the future. We are certain that, if the problem is not corrected, the criminal defense bar will again bring this issue to the attention of the trial courts, as did Appellant's counsel in the instant case.

¶ 12 Judgment of sentence affirmed.

¶ 13 Judge JOHNSON files a concurring opinion.

JOHNSON, J., Concurring:

¶ 1 I agree with the Majority that neither Pennsylvania nor federal caselaw warrants sustaining Richard Hassain Estes's challenge to the process by which Allegheny County creates jury pools under *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). I would rule, however, that the deficiency of Estes's claim lies solely in the weakness of the statistical evidence on which he relies in presenting his challenge. I do not support the Majority's reliance on Estes's failure to present "evidence of a calculated discriminatory practice," or to demonstrate "what discriminatory practice might be causing the systematic exclusion," Maj. Op. at 936, because I find no such requirement in *Taylor* or its progeny. Under the Supremacy Clause, I cannot read Pennsylvania caselaw to narrow an individual's Sixth Amendment right to a representative cross-section of prospective jurors beyond the terms of binding United States Supreme Court Sixth Amendment precedent. *Cf. Commonwealth v. Robin*, 421 Pa. 70, 218 A.2d 546, 546 (1966) (holding that where United States Supreme Court has ruled on the constitutionality of a state statute governing obscenity, that ruling is binding on state courts). Thus, I write separately to explain my objection to the Majority's interpretation of the governing law.

¶ 2 In *Taylor*, the United States Supreme Court held that "the selection of a

petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." 419 U.S. at 528, 95 S.Ct. 692 (citation omitted). "Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case. The broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility." *Id.* at 530–31, 95 S.Ct. 692 (citation omitted).

¶ 3 In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court further explained how a party should proceed with a challenge to the "representative character" of a given venire pool.

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364, 99 S.Ct. 664. The parties do not appear to dispute, thus I will not here address, whether the group Estes claims is improperly excluded from the Allegheny County venire pool is sufficiently numerous and distinct to incur *Duren*'s protection. *See id.* at 364, 99 S.Ct. 664.

¶ 4 It is hard to imagine how the second *Duren* prong could be proved except by competent statistical evidence. *See id.* at 364–66, 99 S.Ct. 664; *see also United States v. Weaver*, 267 F.3d 231, 240 (3d.Cir.2001), *cert. denied* 534 U.S. 1152,

122 S.Ct. 1118, 151 L.Ed.2d 1011 (2002) (*Duren*'s second-prong analysis "is, at least in part, a mathematical exercise, and must be supported by statistical evidence."). In this case, as the Majority notes, Maj. Op. at 935–36, Estes offered in support of his reasonable cross-section argument the testimony of expert witness Dr. John F. Karns, who testified regarding the results of a demographic study he had commissioned to address the composition of Allegheny County jury pools. He compared the data gathered regarding the composition of venire pools from May through September 2001 with census data for the year 2000. From this comparison, Dr. Karns concluded that, while the African–American population of Allegheny County comprises 11.19 percent, African–American venirepersons represented only 4.7 percent of the jury pool for the five-month period he examined. The trial court, however, noted that Dr. Karns's study relied on census data that included people under eighteen years of age, and thus concluded that "the study, while troubling, was incomplete." Maj. Op. at 936 (citing Trial Court Opinion, 9/18/02, at 3). I agree with the trial court's assessment, and add that it is not at all clear that relief may be granted where the statistical evidence in question covers only a five-month period, which period may not provide statistically meaningful evidence of the sort of ongoing disparity the United States Supreme Court requires before granting relief. Neither is it clear that the disparity between 11.19% and 4.7% is sufficient under *Duren* to make out a *prima facie* case. *See, e.g., Weaver*, 267 F.3d at 240–44 (expressing reservations about a disparity as to African–Americans of 3.07% (population) vs. 1.84% (venirepersons) and as to Hispanic–Americans of 0.97% (population) vs. 0.26% (venirepersons)).

¶ 5 The third *prima facie* requirement stated in *Duren,* defendant's demonstration that the underrepresentation of a distinctive group has occurred due to a "systematic exclusion" in the jury selection process, has proved the most challenging factor for courts to assess, and provides the impetus for my separate writing in this case. In *Duren,* the Supreme Court found that the defendant's "demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicate[d] that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized." *Id.* at 366, 99 S.Ct. 664. Thus, the "disproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the *system* by which juries were selected." *Id.* at 367, 99 S.Ct. 664. Women were "systematically underrepresented" within the meaning of *Taylor* due simply to "the operation of Missouri's exemption criteria." *Id.* Nowhere in *Duren* did the Court state or imply that any sort of discriminatory practice or intent need be shown, nor was any present on the face of the jury selection procedure there in question. To prevail on a *Taylor* claim a defendant need show only a "disproportionate and consistent exclusion" of a distinctive group "due to the *system* by which juries" are selected. *See id.* Thus, *Duren* strongly suggested what amounts to a discriminatory impact approach to analysis under the third prong of its *prima facie* case requirement.

¶ 6 *Weaver,* 267 F.3d 231, also informs our analysis, in that it reaches the interpretation of *Duren* set forth above. There, the Court of Appeals unequivocally rejected the government's argument that "where substantial underrepresentation is traceable solely to the exclusive reliance on voter registration lists, and the underrep-

resented group has freely excluded itself quite apart from the system itself, the third prong has not been fulfilled." *Id.* at 244. Indeed, *"intentional discrimination need not to be shown to prove a Sixth Amendment fair cross section claim. Under* Duren, *'systematic exclusion' can be shown by a large discrepancy repeated over time such that the system must be said to bring about the underrepresentation." Id.* (*Duren* citation omitted; emphasis added). Thus, the court noted, "if the use of voter registration lists over time did have the effect of sizeably underrepresenting a particular class or group on the jury venire, then under some circumstances, this could constitute a violation of a defendant's fair cross-section rights under the Sixth Amendment" *Id.* at 245 (internal quotation marks and modifications omitted). In that case, however, the Court of Appeals found nothing in the record that demonstrated such "persistent systematic exclusion" and denied the *Duren* challenge before it.

¶ 7 *Duren*-style claims have recurred periodically in Pennsylvania courts, and our Supreme Court has adapted United States Supreme Court decisions under the Sixth Amendment to Pennsylvania jury-selection procedures when necessary. *See, e.g., Commonwealth v. Johnson,* 576 Pa. 23, 838 A.2d 663 (2003). In that case, after citing *Commonwealth v. Craver,* 547 Pa. 17, 688 A.2d 691, 696 (1997), for Pennsylvania's articulation of the *prima facie* case requirement stated in *Duren,* our Supreme Court stated that "[p]roof is required of an *actual discriminatory practice* in the jury selection process, not merely under-representation of one particular group." *Johnson,* 838 A.2d at 682 (emphasis added). On this basis, the Court went on to observe its prior rejection of challenges to jury panel selection procedures based on voter registration lists and driver's license

rolls. *Id.* (citing *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 868 (2000) (voter registration lists); *Commonwealth v. Henry,* 524 Pa. 135, 569 A.2d 929, 933 (1990) (driver's license lists)). Thus, in *Johnson,* the defendant was not entitled to relief because he presented no evidence or argument revealing "systematic exclusion," so defined, and therefore had failed to establish a constitutional violation.

¶ 8 Our Supreme Court's apparent requirement that a defendant demonstrate an "actual discriminatory practice" as part of his *prima facie* case of constitutionally deficient jury selection procedures is in tension with *Duren,* where the underrepresentation itself was the constitutional focus, not the particular means by which such underrepresentation occurred, or the intention of those bodies responsible for the given procedure. *See Duren,* 439 U.S. at 366, 99 S.Ct. 664. Thus, in that case, "the cause of the underrepresentation" was found to be "systematic" not in virtue of its peculiar characteristics (although those were examined), but simply because "a large discrepancy" between the ratio of women in the population to the ratio of women in the venire pool occurred on a consistent basis for nearly a year. That is, the discrepancy *itself* "manifestly indicate[d]" a systematic exclusion—one "inherent in the particular jury-selection process," as assessed by reference to the impact of that process rather than its peculiar contours. *See id.* Thus, *Duren* stands for the proposition that it can be sufficient that a manifest discrepancy recurs to establish a systematic exclusion notwithstanding defendant's failure to demonstrate precisely what about the system created the exclusion. *See also Weaver,* 267 F.3d at 244–45 (finding that "intentional discrimination need *not* to be shown to prove a Sixth Amendment fair cross section claim"; hypothesizing that if use of voter registration lists

ultimately created a prevailing underrepresentation of a particular class or group in a venire pool, a demonstration of that phenomenon without more might establish a Sixth Amendment claim).

¶ 9 The Majority, however, adopts a brief excerpt from *Johnson* that, if read as the Majority would, reduces Pennsylvania defendants' Sixth Amendment rights impermissibly under *Duren* and its progeny. I cannot read *Johnson* so broadly as to diminish the rights of defendants under *Duren,* and thus cannot join the Majority Opinion's interpretation of that case. Unlike the Majority, I would not require a defendant to demonstrate, as part of a *prima facie* case, that underrepresentation occurred as part of a "calculated discriminatory practice," or that a defendant include "argument as to what discriminatory practice might be causing the systematic exclusion." Maj. Op. at 936. I must, therefore, reject the Majority's interpretation of *Johnson* that the "mere showing of underrepresentation, absent an *actual discriminatory practice* in the jury selection process, causes [Estes'] constitutional claim to fail." Since *Johnson* must give way to *Duren,* I would read *Johnson* to permit a defendant to satisfy the third *Duren* prong by reference to statistical evidence demonstrating a continuing and manifest underrepresentation of a distinctive group from a given jurisdiction's venire pool notwithstanding the absence of proof of a discriminatory intent or an "actual discriminatory practice."

¶ 10 I ultimately agree, however, with the Majority's conclusions regarding the deficiency of Estes' statistical proof to satisfy the first *Duren* prong, for the reasons stated above. My decision, as the Majority's, is in part informed by the recent efforts of the Honorable Joseph M. James to improve the representative quality of Allegheny County jury pools, as it is in-

formed by the fact that the trial judge in Estes's case took extraordinary steps to improve the representative quality of the jury at Estes's trial. Thus, I am constrained to conclude that Estes has failed to satisfy the second prong of *Duren*'s *prima facie* case requirement. I therefore concur on that basis alone in the denial of Estes's Sixth Amendment challenge.