J-S03009-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DERRICK LEE JORDAN, | |
| Appellant | No. 1000 EDA 2016 |

Appeal from the Judgment of Sentence Entered November 10, 2015
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0006259-2014

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED APRIL 16, 2018**

Appellant, Derrick Lee Jordan, appeals from the judgment of sentence of an aggregate term of 4-8 years' incarceration followed by 5 years' probation, following his conviction for aggravated assault, robbery of a motor vehicle, and related offenses. Herein, Appellant challenges the denial of his suppression motion, the denial of his motion to strike the jury panel without a hearing, the denial of his **Batson**[1] challenge, and the trial court's admission of medical records evidence. After careful review, we affirm on the basis set forth in the trial court's Pa.R.A.P. 1925(a) opinion.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] **See Batson v. Kentucky**, 476 U.S. 79 (1986).

The trial court thoroughly summarized the facts of this case in its Rule 1925(a) opinion. **See** Trial Court Opinion ("TCO"), 7/18/17, at 2-14. Briefly, Appellant called a cab driver, Victim, in the early morning hours of August 12, 2014. **Id.** at 2-3. When Victim informed Appellant that a deposit was required due to the distance to the requested destination, Appellant punched and stabbed Victim while saying, "die motherfucker." **Id.** at 3. After a brief struggle, Victim exited the cab through the driver's side window while it was still moving. **Id.** Appellant then drove away in the abandoned vehicle. **Id.** at 4.

Appellant quickly became a suspect when the police traced the phone call made to the cab company, and Victim soon thereafter identified him from a photo array. **Id.** at 5. The police immediately arrested Appellant and subjected him to a custodial interrogation. **Id.** at 5-6. The police read Appellant his **Miranda**[2] warnings, and obtained his verbal consent to proceed with questioning. **Id.** at 6. However, on the written **Miranda** rights waiver colloquy, Appellant answered "no" to the following questions: "Do you understand your Constitutional Rights that were read and explained to you?" and "With these Constitutional Rights in mind, are you willing to talk with us and give us a voluntary statement?" **Id.** In Appellant's statement, he claimed to have acted in self-defense. **Id.** at 7.

_____

[2] **See Miranda v. Arizona**, 384 U.S. 436 (1966).

The Commonwealth charged Appellant with, *inter alia*, aggravated assault,[3] aggravated assault with a deadly weapon,[4] robbery of a motor vehicle,[5] simple assault,[6] and possession of an instrument of crime.[7,8] Appellant filed a motion seeking to suppress his statement to police on May 4, 2015. The trial court then promptly held a suppression hearing on May 29, 2015. The court denied Appellant's motion to suppress on June 30, 2015.

Appellant's three-day jury trial commenced on August 11, 2015. On August 13, 2015, the jury found Appellant guilty of all the aforementioned offenses. On November 10, 2015, the trial court sentenced Appellant to 4-8 years' incarceration and five years' consecutive probation for aggravated assault; 3-6 years' incarceration for robbery of a motor vehicle, concurrent to the term of incarceration imposed for aggravated assault, with a consecutive term of 5 years' probation; and 5 years' probation, concurrent

_____

[3] 18 Pa.C.S. § 2702(a)(1).

[4] 18 Pa.C.S. § 2702(a)(4).

[5] 18 Pa.C.S. § 3702.

[6] 18 Pa.C.S. § 2701.

[7] 18 Pa.C.S. § 907(b).

[8] The Commonwealth charged Appellant with numerous other crimes; however, the unlisted charges were either withdrawn, *nolle prossed*, or resulted in acquittal.

to the term of probation imposed for aggravated assault, for possession of an instrument of crime. Appellant timely filed a post-sentence motion, which the trial court denied on March 2, 2016. He then timely filed a notice of appeal on March 29, 2016.

Appellant now presents the following questions for our review:

1. Whether the pre-trial suppression motion was erroneously denied[?]

2. Whether the trial court erred in denying Appellant's motion to strike the jury panel based on the lack of a representative sample of African-Americans on the panel[?] It is Appellant's contention that the trial court should have scheduled the matter for a hearing.

3. Whether the trial court erred in denying Appellant's **Batson/Johnson v. California**[9] challenge[?]

4. Whether the trial court erred where defense counsel objected to the medical records being admitted because the originally agreed upon stipulation did not comport with the stipulation the prosecutor drew up to be read at trial to the jury.

Appellant's Brief at 7.

After a thorough review of the record, Appellant's brief, the applicable law, and the comprehensive and well-reasoned opinion of the trial court, we conclude that there is no merit to Appellant's claims on appeal, and do so based on the reasons set forth in that opinion. **See** TCO at 23-24 (rejecting Appellant's first claim, concerning the denial of the motion to suppress his

---

[9] **See Johnson v. California**, 545 U.S. 162 (2005).

statement to the police);[10] *id.* at 24-27 (rejecting Appellant's second and third claims, concerning matters that arose during jury selection); *id.* at 27-29 (rejecting Appellant's fourth claim, concerning the court's admission of medical records).

Judgment of sentence *affirmed*.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/16/18

---

[10] This section of the trial court's opinion is supplemented by the court's Findings of Fact and Conclusions of Law, dated June 30, 2015, which is also attached hereto immediately following the trial court's opinion.

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY,
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :    SUPERIOR COURT
                                  :    NO. 1000 EDA 2016

           v.                 :

                                  :    TRIAL COURT
DERRICK LEE JORDAN                 :    NO. 6259-2014

ROGERS, J.                                     JULY 18, 2017

## OPINION

## I. INTRODUCTION

Following deliberations after a three-day trial, a jury convicted Derrick Lee Jordan ("Appellant") on one (1) count each of aggravated assault,[1] aggravated assault with a deadly weapon,[2] robbery of motor vehicle,[3] simple assault,[4] recklessly endangering another person,[5] and



---

[1] 18 Pa.C.S.A. § 2702(a)(1).

[2] 18 Pa.C.S.A. § 2702(a)(4).

[3] 18 Pa.C.S.A. § 3702(a).

[4] 18 Pa.C.S.A. § 2701(a)(1).

[5] 18 Pa.C.S.A. § 2705.

possession of a weapon with intent to employ it criminally.[6] The jury acquitted Appellant of attempted murder and terroristic threats.

The undersigned imposed a standard range sentence of four (4) to eight (8) years' imprisonment in a state correctional institution on count 2 for aggravated assault, attempt to cause serious bodily injury,[7] with a five-year probationary period to run consecutive to the expiration of parole, a concurrent standard range sentence of three (3) to six (6) years on count 4 for robbery of a motor vehicle, with a five-year probationary period to run consecutive to the expiration of parole and a sentence of probation for five (5) years on count 18 for possession of a weapon with intent to employ it criminally to run concurrent to the probation imposed at count 2. The court determined that counts 3, 12 and 15 all merged for sentencing. Appellant now appeals from this judgment of sentence.

## II. FACTS AND PROCEDURAL HISTORY

The relevant facts and procedural history underlying this appeal are as follows. Anthony Arena ("Arena" or "Victim") started his twelve-hour shift as a cab driver for Germantown Cab at 5:30 p.m. on August 11, 2014. (Notes of Testimony ("N.T.") Trial, 8/12/15, at 8, 10-11). Mr. Arena drove a Crown Victoria sedan with two (2) bucket seats in the front and a

---

[6] 18 Pa.C.S.A. § 907(b).

[7] To the interrogatory question of "do you find that defendant caused serious bodily injury?", the jury responded "no".

2

bench seat in the back. There was no barrier in between the front and the back seats, unlike a typical cab. (*Id.* at 9). Shortly before 4:00 a.m. on August 12, 2014, Mr. Arena received a call from dispatch and drove to the 200 block of Elm Street in Norristown to pick up a fare. (*Id.* at 11). When Mr. Arena arrived at the Elm Street address, Appellant entered the back seat of the cab with a bag. (*Id.* at 12). Appellant sat directly behind Mr. Arena and told Mr. Arena he was going to Clifton Heights. (*Id.* at 14). The victim testified that he is 5'6". (*Id.* at 26).

When Mr. Arena finally determined that Clifton Heights was approximately thirteen (13) miles away, he explained to Appellant that pursuant to company policy he was requesting a down payment of twenty dollars ($20). (*Id.* at 14-15, 16). After trying to explain to Appellant that it was nothing personal, just company policy to obtain a down payment when a customer wants to travel that distance and at an off hour, Mr. Arena felt what he described as a "punch" in his side. (*Id.* at 17-18). The Victim slammed on the brakes, at which point Appellant flew into the front of the cab. Then the Victim stepped on the gas and Appellant flew back into the backseat. (*Id.* at 18). Appellant then stabbed the Victim with a knife in the shoulder and in the Victim's neck while calling him a "pussy" and saying "die motherfucker." (*Id.* at 18-19). The Victim grabbed the knife and tried to take it from Appellant, breaking the knife. (*Id.* at 20). Fearing for his life, Mr. Arena jumped through the open driver's side window to escape from Appellant while the cab was still moving. (*Id.* at

3

19, 21). Appellant tried unsuccessfully to pull the Victim back into the cab, grabbing his shoe. (*Id.* at 19, 21). Mr. Arena watched as Appellant jumped into the front seat of his cab and drove away. (*Id.* at 19-20). While bleeding profusely and holding his side, the Victim knocked on doors in the neighborhood until someone called the police. (*Id.* at 20, 22).

While on patrol at approximately 4:00 a.m. in the Borough of Norristown, Patrol Officer Carl Robinson, Jr. received a radio call to investigate a report of a stabbing in the 700 block of East Main Street in Norristown. (N.T. Trial, 8/11/15 at 61-62). When Officer Robinson made contact with the Victim, the Officer could see a large amount of blood coming out of the Victim's right side and a large amount of blood coming out of his left arm near his shoulder. (*Id.* at 64). The Victim provided Officer Robinson with a description of the man who had stabbed him and a description of the cab the Victim had been driving that morning while they waited for the ambulance to arrive. (*Id.* at 64-65). An ambulance arrived and took the Victim to the emergency room at Paoli Hospital in Chester County. (N.T. Trial, 8/12/15 at 23, 24). After the ambulance left the scene with the Victim, Officer Robinson traveled down the street approximately half a mile and located the taxicab at East Main and Walnut Street in Norristown. (N.T. Trial, 8/11/15 at 68). The cab had been abandoned in the intersection, still running. (*Id.*).

Detective Adam Schurr of the Norristown Police Department started his shift at 7:00 a.m. on August 12, 2014. (N.T. Trial, 8/12/15 at 90).

4

After being assigned to this investigation, Detective Schurr began to gather information. Detective Schurr learned that Mr. Arena's cab had been secured in the bay area of the police station and went out to look at it. (*Id.*). Inside, he found a broken knife in the middle of the backseat of the cab, which he collected and secured for DNA purposes, placing the blade and handle in an evidence locker. (*Id.* at 90-91). Detective Schurr developed Appellant as the main suspect in the case based on the cell phone number used to call Germantown Cab Company earlier that morning. (*Id.* at 94-95). As a result, Detective Schurr assembled a photo array which included Appellant's photograph and contacted Mr. Arena to come to the Norristown Police Department. (*Id.* at 95-96).

The Victim came to the Police Department on August 12, 2014, still dressed in his hospital gown. (*Id.* at 96). After Detective Schurr read the department instructions regarding photograph lineups, Mr. Arena picked out and signed the photograph of Appellant from the array. (*Id.* at 99-101). The Victim also provided the detective with a statement. (*Id.* at 101). As part of that statement, Mr. Arena told Detective Schurr that Appellant kept saying, "die mother fucker, you piece of shit" while Appellant was stabbing him. (affidavit of probable cause sworn and subscribed on August 13, 2014).

Norristown patrol officers brought Appellant into the Norristown Police Department that same day. (N.T. Trial, 8/12/15 at 101). Detective Schurr met Appellant in the cell area and asked Appellant if he would like

5

to speak with the Detective about the incident with the cab driver. Appellant indicated that he would like to speak with Detective Schurr. (*Id.* at 102). Accordingly, Detective Schurr brought Appellant to Detective Angelucci's office to speak with Appellant. (*Id.* at 102). Present for the interview was Detective Angelucci, Detective Schurr and Appellant. (*Id.* at 102). Detective Schurr then read Appellant his *Miranda* warnings.[8] Detective Schurr admittedly did not notice until much later in the investigation that Appellant had written the answer "no" to the two questions on the form: "Do you understand your Constitutional Rights that were read and explained to you?" and "[w]ith these Constitutional Rights in mind, are you willing to talk with us and give us a voluntary statement?" (*Id.* at 103-06). After verbally acknowledging his rights and agreeing to speak with the detectives, Appellant provided a statement, signed and dated each page and initialed the handwritten changes he made to that statement. (*Id.* at 109-10, 118-19).

Following a preliminary hearing before Magisterial District Judge Margaret A. Hunsicker on August 22, 2014, a *prima facie* case was established and Appellant was bound over for trial on the afore-mentioned charges. Benjamin Cooper, Esquire of the Montgomery County Public Defender's Office filed his entry of appearance on behalf of Appellant on November 20, 2014. On May 4, 2015, Attorney Cooper filed a motion to suppress in which he raised a general claim that Appellant's statement

---

[8] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6

was involuntary and without adequate *Miranda* warnings or voluntary waiver of such warnings.

The court conducted a suppression hearing on May 29, 2015.[9] Appellant presented no argument or case law regarding his claim that he had not knowingly, intelligently and voluntarily waived his *Miranda* rights before providing a statement. Rather, Appellant's only assertion at the hearing was that he did not sign the statement. (N.T. Suppression Hearing, 5/29/15 at 7). The court issued its Findings of Fact and Conclusions of Law Pursuant to Rule 581(I) on June 30, 2015. Therein, the undersigned "found Detective Schurr's testimony to be credible, including the reason he gave for not noticing that [Appellant] had written "no" on the Constitutional Rights form was because [Appellant] had verbally responded "yes" that he understood his rights and wished to proceed." (Findings of Fact and Conclusions of Law Pursuant to Rule 581(I) of the Pennsylvania Rules of Criminal Procedure, docketed June 30, 2015, at 10).

Specifically, the written statement typed by Detective Angelucci states:

> My name is Detective Schurr [,] this is Detective Angelucci [,] we are with the Norristown Police Department. This statement is regarding a stabbing. (under which Appellant handwrote the words "self-defense").

---

[9] The court's Findings of Fact and Conclusions of Law Pursuant to Rule 581(I) of the Pennsylvania Rules of Criminal Procedure docketed on June 30, 2015, are incorporated as though fully set forth herein.

Q: Is it okay to ask you some questions?
A.: Yes

\* \* \* \*

Q: Have you read and do you understand your Miranda Warnings?
A: Yes

Q: With these rights in mind are you willing to speak with us?
A: Yes

\* \* \* \*

Q: Is everything you have started [sic] true to the best of your knowledge?
A: Yes

\* \* \* \*

Q: Have you been threatened or coerced in any way in order to give this statement?
A: No

Q: Have you been given time to read over and make any corrections to this statement?
A: [DJ] (handwritten initials)

(N.T. Suppression Hearing, 5/29/15, Commonwealth Exhibit C-1). On the statistical information obtained, Appellant is listed as 6'3" and 220 pounds. (*Id.*; N.T. Trial, 8/12/15 at 119). The undersigned issued an order denying Appellant's motion to suppress on June 30, 2015, and Appellant proceeded to trial on August 11, 2015.

In the morning of the first day of trial, Attorney Cooper moved to strike the jury panel. Specifically, the following exchange took place:

MR. COOPER: Your Honor, I've gone over the jury selection information prior to voir dire. I would like to make the record that there are 45 perspective panelists on the jury, four of

which are of the African American race, one of which is of a race described as other, and the rest are Caucasian.

It is my motion to strike this panel on the basis that it underrepresents the potential for [Appellant] to have a jury of his peers since he, in fact, is of African American [descent].

I am not alleging that there was a deliberate attempt to have a reduction in minority population, but based on the random selection, I would motion that a new panel should be given to us for selection based on the claim that I've raised.

\*     \*     \*     \*

MS. CARNEY: Your Honor, I would object to the striking of this panel. I would argue that this is a fair and proportionate representation of the citizens of Montgomery County as reflected in that population and we should proceed with this chosen panel.

(N.T. Trial, 8/11/15 at 3-4). The undersigned concluded that four (4) out of forty-five (45) was a fair representation of the population based on the court's experience and denied Appellant's motion. (*Id.* at 4).

Later that afternoon, Appellant challenged the Commonwealth's peremptory strike of an African American juror from the alternate jurors. Attorney Cooper posited:

He's an African American juror. I have -- based on the selection process that we did up until now, I believe there were two African Americans, although Juror Number ..., he said he was black, but his name is a foreign-sounding name and I'm not sure if he's African American. My client is African American.

\*     \*     \*     \*

I'm doing a *Batson* challenge with respect to the following. The Commonwealth struck an alternate juror who was questioned individually, and that person is African American. Of the prospective members of the jury to be chosen in this case, there [was] one in the original panel of 12 who is self-

described on the form as black, but his name sounds as if it is either Arabic or Muslim.

(*Id.* at 10, 13-14). Attorney Cooper argued that he was not required to prove a pattern and he was not required to present a *prima facie* case that race was the reason for the striking of the alternate juror based on case law subsequent to *Batson*.[10] (*Id.* at 11-12). However, Counsel did not provide the court with the referenced case law. After hearing argument, the court denied Appellant's challenge. (*Id.* at 16-17).

On the second day of trial, Attorney Cooper objected to a medical record that the Commonwealth intended to introduce because the findings on the record were outside the language of the attorneys' agreed upon stipulation. Specifically, Attorney Cooper argued as follows:

> With regard to this, the Commonwealth is seeking to admit a document as an exhibit which displays a diagram of the wounds allegedly suffered by the victim in this case. There's also wording written; I'm not sure whose writing it is, but it says that for the neck and chest there were stab wounds. That is the medical - - that's what's written in the document. I'm objecting to that as not what I stipulated to.
>
> What my stipulation was is that the victim, Anthony Arena, suffered lacerations to various areas of his body and was treated by sutures by the doctor in this case, Dr. Laurel Krouse. I did not stipulate that the conclusion was stab wounds, and therefore I'm objecting to the use of that language being displayed to the jury.

(N.T. Trial, 8/12/15, at 4-5). After hearing from both parties that the Commonwealth had provided timely notice of the use of the medical records and in compliance with the rules of evidence, the

---

[10] *Batson v. Kentucky*, 106 S.Ct. 1712 (U.S. 1986).

undersigned overruled Attorney Cooper's objection. (*Id.* at 5-6). The Commonwealth then read the following stipulation:

> The parties hereby agree that if called, the records custodian from Paoli Hospital would testify that the Court was provided with an accurate and authentic copy of the medical record for Anthony Arena, and the records were made and kept in the ordinary course of hospital business. The parties further agree that these medical records show that [] Anthony Arena was admitted into the emergency room at Paoli Hospital on August 12, 2014, at 4:44 a.m. and discharged at 7:24 a.m. Finally, the parties hereby agree that if called, Dr. Laurel Krouse would testify that he was Anthony Arena's physician on August 12, 2014. Dr. Krouse would testify that he examined Arena and, based on his medical training and expertise, Arena had the following injuries: 1 ½ centimeter laceration to the anterior neck, laceration to the lower right and the lateral chest, lacerations to the left arm and right hand. Further, Dr. Krouse would testify that Arena's injuries were treated by sutures.

(*Id.* at 23-24).

In addition to the medical records, the Commonwealth presented the testimony of Mr. Arena, Officer Robinson, Detective Schurr and Ms. Jennifer Sears, a forensic biologist with NMS Labs. After being recognized by the court as an expert in forensic biology, Ms. Sears testified regarding the lab analysis of the broken knife blade and handle and Appellant's DNA from a swab kit. (*Id.* at 166, 170, 172, 179, 181).

Detective Schurr testified about his role in the investigation and his taking of Appellant's statement in which Appellant admitted to "tussling" with the Victim, but doing so in self-defense. (*Id.* at 103-19). Detective Schurr explained on direct examination and during a thorough cross examination about why he continued to question Appellant when

11

Appellant had responded "no" in writing to the two questions on the *Miranda* form. As he had done at the earlier suppression hearing, Detective Schurr described the relaxed interaction between Appellant and the detectives. (*Id.* at 105). He explained to the jury how he reviewed Appellant's rights with Appellant and handed him the form to sign. Detective Schurr testified that he would have double checked with Appellant that he wanted to continue if he had seen the written responses but, because Appellant had verbally answered the questions "yes" (Ex. C-11), Detective Schurr mistakenly did not closely check the form once he saw Appellant's signature. (*Id.* at 105-06, 147-48, 150).

In the afternoon of the second day of trial, the Commonwealth rested their case. After the Commonwealth moved their exhibits into evidence, Attorney Cooper made a motion for judgment of acquittal on all counts. (*Id.* at 186). Having viewed all of the evidence in favor of the Commonwealth as the nonmoving party, the undersigned denied Appellant's motion. (*Id.* at 187).

Appellant presented two (2) witnesses at trial. Mr. William Wadsworth, a retired schoolteacher and youth mentor and minister, testified as to Appellant's reputation as a peaceful and law-abiding citizen. (*Id.* at 194-97). Additionally, Appellant presented the expert testimony of Katherine Cross, a forensic biologist, who made comparisons of DNA profiles from the knife blade and knife handle against two reference samples, one from the Victim and one from Appellant. (*Id.* at 198, 203-

12

04). She opined that both individual's DNA came into contact with the knife handle. (*Id.* at 205, 207).

Following closing arguments, the court instructed the jury on, *inter alia*, the elements of the offenses, the defense of self-defense and the voluntariness of Appellant's statement to Detective Schurr. (N.T. Trial, 8/13/15, at 30-34, 34-40, 40-52). The jury returned with its verdict as previously noted.

After reviewing and considering the trial notes of testimony, the victim impact testimony, Appellant's presentence investigation report ("PSI"), the absence of any prior criminal history, Appellant's statement to the PSI probation officer, Appellant's issues with anger management, and the arguments by Counsel, the undersigned imposed Appellant's sentence on Tuesday, November 10, 2015. (N.T. Sentencing Hearing, 11/10/15, at 21-26). Appellant received an aggregate sentence of four (4) to eight (8) years' imprisonment followed by five (5) years of probation to be served after the expiration of his parole. The court also ordered a PPI evaluation and directed that Appellant comply with any terms or conditions as recommended in the PPI evaluation as determined by the Pennsylvania Board of Probation and Parole, including but not limited to, anger management recommendations. (*Id.* at 26).

Attorney Cooper filed a timely post-sentence motion on Appellant's behalf on November 17, 2015, which this court denied by order docketed on March 2, 2016. On March 29, 2016, Appellant filed a notice of appeal

13

to the Superior Court of Pennsylvania ("Superior Court"). The undersigned directed Appellant to file a concise statement of the matters complained of on appeal ["Statement"], pursuant to Pa.R.A.P. 1925(b) by order docketed on March 30, 2014. Appellant filed a "Preliminary Concise Statement with Application for Extension of Sixty Days to Supplement or Amend after Reviewing the Notes of Testimony and Confering [sic] with Appellant" ("Preliminary Concise Statement") on April 12, 2016. After the court granted Appellant's motion to extend time on April 27, 2016, Appellant filed his Supplemental Concise Statement on July 11, 2016.

## III. ISSUES

Appellant raises the following issues on appeal:

1. [S-4] The trial court erred in denying the motion for judgment of acquittal to the aggravated assault charges.

2. [P-4a] The guilty verdict rendered by the jury on August 13, 2015, was against the weight of the evidence in that the jury gave undue weight to the testimony of Anthony Arena, Detective Adam Schurr and the medical records.

3. [P-4c] The pre-trial suppression motion was erroneously denied where the statements given were involuntary, coerced and without Miranda in violation of the United States and Pennsylvania Constitutions.

[S-1] [Appellant's] alleged Miranda waiver was not knowing, voluntary and intelligent where he indicated that he did not understand his constitutional rights. (8-12-15 p. 145 L. 1-10). When asked if he was willing to talk and give a voluntary statement [sic] answered the question "no". (8-12-15 p. 146 l. 9-11). [Appellant] was not free to leave, he was shackled hand and foot during the statement. (NT 5-29-15 p. 12). The answer "no" was just inches above the officer's own signature. (NT 8-12-15 p. 145 L. 11-20).

14

Even though the recording officer indicated in his testimony, "we both missed it-it was embarrassing" even if true, the statement should still have been suppressed. (NT 8-12-15 p. 149 L. 8). The mere fact the officers did not see the answers and Appellant continued to talk does not satisfy the Constitutional mandate that the Government has the obligation to scrupulously protect Appellant's Constitutional rights. Appellant indicated in the statement that he did not understand his constitutional rights and that he was not willing to talk or give a statement. (NT 5-29-15 p. 30). The officers continued to question Appellant after he invoked his rights. (NT 5-29-15 p. 36-37). In fact, the officer indicated that even if her [sic] had seen the "no" he would have changed the answer to "yes" and had Appellant initial it. (P. 105 L. 22-25); (NT 8-12-15 p. 106 L. 14-15).

4. [S-2] The trial court erred in denying [A]ppellant's motion to strike the jury panel based on the lack of a representative sample of African-Americans on the panel. It is Appellant's contention that the trial court should have scheduled the matter for a hearing. The trial court erred in denying Appellant's Batson/Johnson v. California challenge. (N.T. 8-11-15, p. 9-18).

5. [S-3] Defense counsel objected to the medical records being admitted because the originally agreed upon stipulation did not comport with the stipulation the prosecutor drew up to be read at trial to the jury. Specifically, [Attorney] Cooper objected to any inclusion in the stipulation that the complainant was stabbed. (NT 8-12-15 p. 5 L. 8-25; p. 6). The objection should have been sustained.

In addition, even though defense counsel objected, the statement was still introduced over objection as a stipulation rather than just as a business record. (NT 8-12-15 p. 24).

6. [P-4b] The sentence handed down was unreasonable in light of the circumstances and [Appellant's] personal history where the sentences were consecutive and his rehabilitative factors were not taken into account.

(Appellant's Preliminary Concise Statement, filed April 12, 2016; Appellant's Supplemental Concise Statement, filed July 11, 2016).[11]

## IV. DISCUSSION

In his first issue on appeal, Appellant challenges the court's denial of his motion for judgment of acquittal on the two (2) charges of aggravated assault. Appellant's claim warrants no relief.

Pennsylvania case law provides in pertinent part as follows:

> A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge.

*Commonwealth v. Richard*, 150 A.3d 504, 514 (Pa.Super. 2016) (citing *Commonwealth v. Abed*, 989 A.2d 23, 26 (Pa.Super. 2010)); *Commonwealth v. Devries*, 112 A.3d 663, 667 (Pa.Super. 2015) (citing *Commonwealth v. Emanuel*, 86 A.3d 892, 894 (Pa.Super. 2014)).

When reviewing a sufficiency of the evidence claim, the standard to be applied

> is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding

---

[11] The court has reordered Appellant's issues for ease of disposition. Appellant's original order of issues presented in his Statement is noted with a [P-*.] for the Preliminary Concise Statement and [S-*] for the Supplemental Concise Statement.

16

a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Fitzpatrick*, 159 A.3d 562, 567 (Pa.Super. 2017) (citing

*Commonwealth v. Hutchinson*, 947 A.2d 800, 805–806 (Pa.Super. 2008));

accord *Devries, supra* (citation omitted).

The charge of aggravated assault is defined by statute as follows:

**§ 2702. Aggravated assault**

**(a) Offense defined.**--A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

\*     \*     \*     \*

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]

18 Pa.C.S.A. § 2702(a)(1)(4).

"Where the victim does not suffer serious bodily injury, the charge of aggravated assault can be supported only if the evidence supports a finding of an attempt to cause such injury." *Commonwealth v. Martuscelli*, 54 A.3d 940, 948 (Pa.Super. 2012) (citation omitted). An "attempt" to commit aggravated assault can be found where the defendant, with the

17

required specific intent, has acted in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another. *Commonwealth v. Fortune*, 68 A.3d 980, 984 (Pa.Super. 2013) (*en banc*) (citation omitted); *Martuscelli, supra* (citation omitted). "Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Fortune, supra* (citing 18 Pa.C.S.A. § 2301); *Martuscelli, supra* (citing same). "A person acts intentionally with respect to a material element of an offense when ... it is his conscious object to engage in conduct of that nature or to cause such a result[.]" *Martuscelli, supra* (citing *Commonwealth v. Matthew*, 589 Pa. 487, [492], 909 A.2d 1254, [1257] (2006)).

The statute's intent requirement can also be met when the defendant acts recklessly under circumstances manifesting an extreme indifference to human life. *Commonwealth v. Burton*, 2 A.3d 598, 602 (Pa.Super. 2010) (*en banc*) (citing *Commonwealth v. Patrick*, 933 A.2d 1043, 1046 (Pa.Super. 2007) (*en banc*)). "As intent is a subjective frame of mind, it is of necessity difficult of direct proof." *Martuscelli, supra* (citing *Matthew, supra*). Accordingly, the appellate courts have held that intent may be proven through circumstantial evidence and inferred from acts, conduct or attendant circumstances. *Fortune, supra* (citation omitted).

The Pennsylvania Supreme Court has created a totality of the circumstances test, to be used on a case-by-case basis, to assist in the determination of whether a defendant has acted with the necessary intent to inflict serious bodily injury. *Matthew, supra* (citing *Commonwealth v. Alexander*, 477 Pa. 190, 383 A.2d 887 (1978)); *Fortune, supra* (citing same). Although the list is incomplete, some of the factors include 1) whether there was a disparity in size and strength between the defendant and the victim; 2) whether the defendant would have escalated the attack had he or she not been restrained from doing so; 3) whether the defendant was in possession of a weapon, and 4) whether defendant made any statements indicative of his or her intent to inflict injury before, during or after the attack. *Matthew, supra* (citing *Alexander, supra* at *889*; *Fortune, supra* ) (citations omitted).

Instantly, after the Commonwealth rested its case in chief, Appellant made a general motion for judgment of acquittal on all counts, specifically mentioning attempted murder, aggravated assault and robbery by motor vehicle. However, Attorney Cooper's argument on the motion was limited to addressing the insufficiency of the evidence only on the charge of robbery by motor vehicle. (N.T. Trial, 8/12/15 at 186). In response, ADA Carney argued that the Commonwealth had met their burden for sending the case to the jury by demonstrating the Victim had identified Appellant as the person who attacked him by stabbing him with a knife in vital

areas of the Victim's body. (*Id.* at 186-87). The undersigned agreed with the Commonwealth.

A review of the evidence presented in light of the factors originally set forth in *Alexander* lead to the inexorable conclusion that the Commonwealth proffered more than sufficient evidence that Appellant attacked the Victim with a deadly weapon with the intent to inflict serious bodily injury. Specifically, 1) Mr. Arena at 5'6" (N.T. Trial, 8/12/15 at 26) was sitting in the front seat of the cab with Appellant at 6'3" and 220 pounds (*Id.* at 119) in the backseat directly behind him and with no barrier in between them; 2) to escape the attack, the Victim jumped out of the open driver's side window while the car was still moving. Appellant tried to pull him back into the cab, pulling off the Victim's shoe; 3) as Appellant stabbed him in the side, shoulder and neck with a knife, the Victim feared for his life and thought about his children. As the Victim went to grab the knife to defend himself, it broke off in his hand. Paoli Hospital medical records revealed stab wounds and lacerations to the Victim's chest, neck, shoulder, hand and arm, and 4) as Appellant repeatedly stabbed the Victim, Appellant called him a "pussy" and "a piece of shit" and said "die, motherfucker, die". Viewing the totality of the circumstances, the Commonwealth carried its burden on the charges of aggravated assault. Hence, Appellant's first issue on appeal is utterly lacking in merit and must fail.

Appellant asserts in his second issue that the jury's guilty verdicts were not supported by the weight of the evidence. Specifically, Appellant complains that the jury placed undue weight on the testimony of the Victim, Mr. Arena, the investigating officer, Detective Adam Schurr, and the Victim's medical records from Paoli Hospital. Appellant's claim merits no relief.

In contrast to a sufficiency claim, "[a] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Thompson*, 106 A.3d 742, 758 (Pa.Super. 2014) (citing *Commonwealth v. Lewis*, 911 A.2d 558, 566 (Pa.Super. 2006)). In bringing this claim, an appellant seeks "a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." *Commonwealth v. Diaz*, 152 A.3d 1040, 1046 (Pa.Super. 2016) (citing *Commonwealth v. Lyons*, 622 Pa. 91, [116], 79 A.3d 1053, 1067 (2013)). Appellate review of such a challenge is well settled:

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock

21

one's conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence. An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Rosser*, 135 A.3d 1077, 1090 (Pa. Super. 2016) (*en banc*), *quoting Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015), *appeal denied*, 125 A.3d 1198 (Pa. 2015) (citations omitted).

*Diaz, supra.*

In the case *sub judice*, Appellant complains that the jury gave undue weight to the testimony of Mr. Arena and Detective Schurr as well as the medical records. Although Appellant has not specifically stated what evidence is clearly of greater weight that to ignore it is to deny justice, one may infer Appellant's position is that his defense of self-defense was so weighted in favor of acquittal that the jury's guilty verdict should shock one's sense of justice. Having presided over the three-day trial, having heard the testimony and observed the demeanor of all of the witnesses and having seen the medical records, this court disagrees.

The jury simply did not believe that Appellant acted in self-defense, as was entirely within their purview as the finders of fact. Indeed, the jury did weigh all of the evidence presented as arguably demonstrated by their acquittal of Appellant on the charges of attempted murder and terroristic threats and the finding that Mr. Arena did not suffer a serious bodily

22

injury. The jury's verdict does not shock this court's conscience. Appellant's second claim warrants no relief.

In his third issue on appeal, Appellant maintains that the court erred in denying Appellant's motion to suppress his statement to Detective Schurr when he clearly indicated that he did not understand his constitutional rights when he wrote "no" in response to the two questions on the *Miranda* warnings form. Appellant proclaims that his waiver was not knowing, voluntary and intelligent and, therefore, the statement should have been suppressed. Appellant is mistaken.

Preliminarily the court notes that Appellant has not provided any case law, statute or rule, which holds that a police officer must stop questioning a defendant who has written a negative response on the Miranda form but responded in the affirmative verbally to the officer, or the ensuing statement is involuntary *per se*. Rather, Pennsylvania law provides that courts are to apply a totality of circumstances test. *See Lyons*, 622 Pa. at 114, 79 A.3d at 1066.

Long-settled law mandates that the Commonwealth must establish that a challenged statement is admissible only by a preponderance of the evidence. *Commonwealth v. Harrell*, 65 A.3d 420, 434 (Pa.Super. 2013) (citing *Commonwealth v. Nester*, 551 Pa. 157, 162-63, 709 A.2d 879, 882 (1998)); *Commonwealth v. Davis*, 526 A.2d 1205, 1209 (1987) (citation omitted). "[T]o do so, the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an

23

understanding of these warnings." *Commonwealth v. Cohen*, 53 A.3d 882, 886 (Pa.Super. 2012) (citing *Commonwealth v. Baez*, 21 A.3d 1280, 1283 (Pa.Super. 2011)). A defendant by his or her conduct may clearly manifest an intent to waive his or her rights. *Cohen, supra* (collecting cases). *Accord Commonwealth v. Bomar*, 573 Pa. 426, 447, 826 A.2d 831, 843 (2003) (citation omitted).

Instantly, while Detective Schurr readily and candidly admitted that it was a mistake not to catch the written negative responses, he also provided a credible explanation as to why he did not do so. Specifically, Appellant's verbal answers and demeanor gave him no reason to suspect there was any confusion or hesitation on Appellant's part to voluntarily give Detective Schurr his version of the events. After viewing the totality of the circumstances surrounding the waiver, the undersigned concluded that the Commonwealth had demonstrated by a preponderance of the evidence that Appellant understood his rights and voluntarily waived them. (Findings of Fact and Conclusions of Law Pursuant to Rule 581(I) of the Pennsylvania Rules of Criminal Procedure, docketed June 30, 2015 at 8-10). Therefore, this claim is unavailing.[12]

In Appellant's fourth issue on appeal, he has conflated two claims. First Appellant complains the court erred in denying an oral motion to strike the jury panel based on an alleged lack of a representative sample of

---

[12] The court will also note that Attorney Cooper astutely used Appellant's statement to Appellant's benefit in arguing the defense of self-defense.

24

African-Americans on the panel. Appellant contends that the court should have held a hearing, even though Appellant did not request a hearing. The second claim Appellant raises in his fourth issue is that the court erred in denying Appellant's *Batson/Johnson v. California*[13] challenge to the Commonwealth's striking of an alternate juror. Appellant's claims are devoid of merit.

Preliminarily, case law provides that while "the Sixth Amendment to the United States Constitution provides for a trial by a jury of one's peers drawn from a source fairly representative of the community", *Commonwealth v. Estes*, 851 A.2d 933, 934 (Pa.Super. 2004) (citation omitted), an "accused has no right to demand that specific minority groups or even members of his own race be included in his jury." *Commonwealth v. Sanchez*, 614 Pa. 1, 57-8, 36 A.3d 24, 58 (2011); *accord Commonwealth v. Johnson*, 576 Pa. 23, 54-55, 838 A.2d 663, 682 (2003) (citation omitted). Rather, "the U.S. Constitution guarantees a fair trial before an impartial jury, not a trial before what a party perceives as a favorable jury." *Sanchez, supra* (citation omitted). For a defendant to establish a *prima facie* violation of the requirement that a jury array fairly represents the community, the defendant must show:

> (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation of the number of such people in the community; and (3) this underrepresentation is due

---
[13] 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005).

to systematic exclusion of the group in the jury selection process. "Systematic" means caused by or inherent in the system by which juries were selected.

Proof is required of an actual discriminatory practice in the jury selection process, not merely under-representation of one particular group. The defendant bears the initial burden of presenting *prima facie* evidence of discrimination in the jury selection process.

*Estes, supra* at 935 (quoting *Johnson, supra*).

In the case at bar, Appellant simply failed to sustain his initial burden. Moreover, from a practical standpoint, it is also within the undersigned's experience and knowledge that this particular panel did in fact contain a fair and proportionate representation of African Americans living in Montgomery County.[14] Thus, this claim must fail.

In the second prong of Appellant's fourth issue, he asserts the court erred by denying his *Batson* challenge. Contrary to Appellant's argument at trial, however, a defendant has the initial burden, which Appellant did not meet in this case.

In *Batson,* the United States Supreme Court established a three-part inquiry to evaluate claims that a prosecutor engaged in racial discrimination during jury selection. First, a defendant must make a *prima facie* demonstration that the prosecutor exercised peremptory challenges upon the basis of race. Second, the burden then shifts to the prosecutor to articulate a race-neutral explanation for striking the particular juror. Finally, the trial court must determine

---

[14] Montgomery County's official source of population and economic statistics for the Commonwealth are generated by the Pennsylvania State Data Center. The county-by-county race statistics derived from the 2010 U.S. Census and provided by the Data Center lists Montgomery County's Black or African American population at 8.7%. (Pennsylvania State Data Center, March 9, 2011). The proportion in the instant case of four (4) panelists out of forty-five (45) potential jurors constitutes 8.8%.

whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712.

*Commonwealth v. Johnson*, __ Pa. __, __, 139 A.3d 1257, 1282 (2016). *Accord Thompson*, 106 A.3d at 751 (citing *Sanchez, supra* 36 A.3d at 44; *Commonwealth v. Saunders*, 946 A.2d 776, 783 (Pa.Super. 2008) (explaining *Johnson v. California* holds a defendant satisfies *Batson's* first step by producing evidence sufficient to permit the judge to draw an inference that discrimination has occurred).

Instantly, Appellant challenged the Commonwealth's striking of a potential alternate juror who was African American. Specifically, Attorney Cooper asserted that in his view, after an individual *voir dire*, there was nothing indicated to Attorney Cooper that would justify a peremptory strike in anything the potential alternate juror said. (N.T. Trial, 8/11/15 at 10). Appellant failed to make a *prima facie* demonstration, as mandated, that ADA Carney exercised a peremptory challenge upon the basis of race. Accordingly, Appellant's fourth issue merits no relief.

Appellant posits in his fifth issue on appeal that the court abused its discretion in allowing the introduction of medical records that referenced stab wounds when the agreed upon stipulation prior to trial only referenced lacerations and did not include references to stab wounds. Hence, according to Appellant, these records did not comport with the stipulation and the objection should have been sustained. Appellant's claim fails for several reasons.

Preliminary, the objection at trial was to the introduction of the medical record referencing stab wounds, not to the stipulation. An appellant is precluded from arguing a different theory on appeal than the one raised at trial. *See Commonwealth v. Phillips*, 141 A.3d 512, 522 (Pa.Super. 2016) (citations omitted). Moreover, a simple reading of the stipulation reveals no mention of stab wounds. Said another way, the prosecutor did not change the agreed upon original stipulation and the stipulation that was read contained no reference to stab wounds.

Regarding Attorney Cooper's objection to the medical record itself, well-settled Pennsylvania law provides in relevant part as follows:

> "Questions regarding the admission of evidence are left to the sound discretion of the trial court, and we, as an appellate court, will not disturb the trial court's rulings regarding the admissibility of evidence absent an abuse of that discretion." *Commonwealth v. Russell*, 938 A.2d 1082, 1091 (Pa.Super. 2007) (citation omitted). An abuse of discretion is more than a mere error of judgment; rather, an abuse of discretion will be found when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." *Commonwealth v. Busanet*, 572 Pa. 535, 817 A.2d 1060, 1076 (2002) (citation and quotation omitted).

*Commonwealth v. Pukowsky*, 147 A.3d 1229, 1233 (Pa.Super. 2016). *Accord Commonwealth v. Kinard*, 95 A.3d 279, 284 (Pa.Super. 2014) (*en banc*); *Commonwealth v. Witmayer*, 144 A.3d 939, 949 (Pa.Super. 2016) (citation omitted).

At trial in this matter, Attorney Cooper conceded that the Commonwealth had provided timely and proper notice as well as a copy of

28

the medical records in compliance with the rules of evidence. Additionally, the court noted that the medical record was a secondary survey made by the medical doctor noting two stab wounds and complied with the business record exception, distinguishing it from a statement made by a witness or the complainant. (N.T. Trial, 8/12/15 at 6). The court properly exercised its discretion in allowing the admission of the medical records and Appellant's fifth issue is unavailing.

In his final issue on appeal, Appellant contends that the court imposed consecutive sentences without taking Appellant's circumstances, personal history or rehabilitative factors into account. Appellant's claim is belied by the record.

The Superior Court reviews a claim involving the discretionary aspects of sentencing utilizing the following principles:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*    *    *    *

In addition, our Supreme Court has noted that:

> "the guidelines have no binding effect, create no presumption in sentencing, and do not predominate over other sentencing factors—they are advisory guideposts that are valuable, may provide an essential starting point, and that must be respected and considered; they

29

recommend, however, rather than require a particular sentence."

*Commonwealth v. Glass*, 50 A.3d 720, 727-28 (Pa.Super. 2012) (quoting *Commonwealth v. Perry*, [612 Pa. 557, 571,] 32 A.3d 232, 240 (2011)). The *Perry* Court further explained the sentencing court's discretion as follows:

> An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion. *Id.* Indeed, as we explained in [*Commonwealth v.*] *Walls*, [592 Pa. 557, 926 A.2d 957 (2007),] there are significant policy reasons underpinning this deferential standard of review:
>
>> The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision.
>
> *Id.* at 565, 926 A.2d at 961–62 (citations and footnote omitted).

*Perry, supra* at 565, 32 A.3d at 236-37.

The sentencing court's decision must be accorded great weight because it was in the best position to measure "the defendant's character, defiance or indifference, and the overall effect and nature of the crime."

30

*Commonwealth v. Marts*, 889 A.2d 608, 613 (Pa.Super. 2005) (citation omitted)., *Accord Walls, supra* at 565, 926 A.2d at 961.(citations omitted). In addition, "the trial court is permitted to consider the seriousness of the offense and its impact on the community." *Marts, supra* at 615.

Finally, where a sentencing court has imposed a standard-range sentence with the benefit of a pre-sentence report, the appellate courts will assume that the sentencing court "was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Corley*, 31 A.3d 293, 298 (Pa.Super. 2011) (citation omitted). *Accord Commonwealth v. Bonner*, 135 A.3d 592, 605 (Pa.Super. 2016) (citation omitted); *Gonzalez*, 109 A.3d at 732 (citation omitted).

In sentencing Appellant, the undersigned provided a list of considerations that the court took into account in fashioning the sentence. These considerations included Appellant's PSI report, his statement to the PSI probation officer, Appellant's statement by way of allocution, Mr. Arena's credible trial testimony and other trial evidence, Mr. Arena's victim impact testimony, Appellant's lack of a prior criminal history, Appellant's need for rehabilitation and his anger management issues, specific and general deterrence, Counsel's arguments, and the sentencing guidelines. Appellant received standard range sentences on the convictions that are entirely within the sentencing guidelines. Indeed, the court noted that Appellant received a lesser sentence than the

31

undersigned would normally impose under these circumstances because of Appellant's age and lack of a prior record.

The court exercised its considerable discretion in fashioning concurrent, not consecutive, sentences based upon the undersigned's involvement in this case, including pretrial proceedings, trial proceedings and post-trial proceedings. The serious nature of this violent offense committed by Appellant cannot be overstated and the court asks that the sentence imposed be affirmed.

## V. CONCLUSION

Based upon the foregoing analysis, this court respectfully requests that the Superior Court affirm Appellant's judgment of sentence.

**BY THE COURT:**

**THOMAS P. ROGERS, J.**
**Court Of Common Pleas**
**Montgomery County, Pennsylvania**
**38th Judicial District**


Copies sent on 07/18/17 to:
**By Interoffice Mail:**
Deputy District Attorney Robert M. Falin, Chief of Appeals Division,
        Office of the Montgomery County District Attorney
Raymond D. Roberts, Esquire, Chief of Appeals,
        Montgomery County Public Defender's Office

Judicial Secretary

32

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY,
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :      NO. 6259-2014

             v.                    :

DERRICK LEE JORDAN            :

### FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO RULE 581(I) OF THE PENNSYLVANIA RULES OF CRIMINAL PROCEDURE

### FINDINGS OF FACT

1. The Undersigned presided over a suppression hearing on Friday, May 29, 2015 on Defendant's Motion to Suppress Statement filed on May 4, 2015.[1]

2. Detective Adam Robert Schurr has over nineteen (19) years of experience in law enforcement with the Norristown Police Department.

3. Detective Schurr is currently a detective and has been in the detective division for five (5) years working mostly on cases involving robberies and shootings.

4. Before joining the detective division, Detective Schurr worked five (5) years in a specialized unit that handled quality of life crimes and assisted

---

[1] At the close of the Commonwealth's case-in-chief, Defendant's Counsel requested that the record remain open for Defendant's Counsel to consider the engagement of a handwriting expert. On Monday, June 8, 2015, the Court was advised by Defendant's Counsel that he would not be proceeding with a handwriting expert.

county detectives in high-profile investigations and the previous ten (10) years he worked on patrol.

5. Detective Schurr had questioned suspects hundreds of times before August 12, 2014.

6. On August 12, 2014, Detective Schurr was involved in the investigation of a stabbing of a cab driver who had identified Defendant as the person who stabbed him multiple times.

7. Norristown patrol officers had arrested Defendant at the scene very early that morning and brought him to the Borough police station on Airy Street.

8. Detective Schurr met Defendant in the cell area and asked if he would like to speak with the detective about the incident involving the cab driver.

9. Defendant agreed to speak with the detective.

10. Detective Schurr was dressed in khakis and a pullover shirt with an emblem that reads Norristown Detective Division. The detective was not armed and he was not wearing his badge.

11. Detective Schurr led Defendant into the police station office area where Detective Angelucci was already seated at a computer.

12. Defendant was restrained by a belt with arm shackles in front of him. Defendant sat across the desk from Detective Angelucci and Detective Schurr sat to the left of Detective Angelucci and in front of Defendant.

2

13. Detective Angelucci remained seated throughout the interview. Detective Angelucci's weapon was not visible because he remained seated.

14. While Detective Angelucci set up for the interview, Detective Schurr and Defendant discussed nutrition and health.

15. The demeanor of both Defendant and the detective was very relaxed.

16. Detective Angelucci typed in Defendant's vitals, including name, date of birth and address. Detective Angelucci noted the starting time as 1729 or 5:29 p.m.

17. Detective Schurr began reading Defendant his Constitutional Rights under *Miranda*.

18. Detective Schurr explained to Defendant that they were reading Defendant his rights because of the charges of robbery and assault.

19. When Detective Schurr had finished reading the *Miranda* warnings, he asked Defendant to read and sign the form.

20. Defendant wrote "no" to the question "Do you understand your Constitutional Rights that were read and explained to you?"

21. Defendant wrote "no" to the question "With these Constitutional Rights in mind, are you willing to talk with us and give us a voluntary statement?"

22. Defendant signed the form, as did Detective Schurr and Detective Angelucci at 1732 or 5:32 p.m.

3

23. Verbally, Defendant responded that he understood his rights and that he wanted to speak with the detectives.

24. Detective Angelucci typed the questions and answers. Detective Angelucci asked the preliminary questions and Detective Schurr took over with questions about the incident.

25. Defendant responded that he was not under the influence of any drugs or alcohol that would affect his memory or judgment, that he completed the 12th grade and some college, that he understood the *Miranda* warnings and that he wanted to speak with the detectives.

26. Defendant provided his statement, including an admission that he had stabbed a cab driver in a cab that one of his "home boys" had called for him from Defendant's phone.

27. Neither detective made any promises to Defendant.

28. Neither detective brandished a weapon or subjected Defendant to any physical contact.

29. Defendant appeared to understand the questions asked and responded with appropriate answers.

30. Defendant was lucid and the conversation was casual. Detective Schurr noticed that Defendant tightened up and displayed a little anger while he talked about the incident but there was no negative interaction with the detectives.

31. The interview lasted approximately thirty to forty-five (30-45) minutes.

32. At the conclusion of the interview, Detective Schurr gave Defendant the opportunity to read over his statement and make any corrections to it.

33. On page one (1) of the statement, Defendant hand wrote in "self-defense" underneath the words "This statement is regarding a stabbing." On page two (2) of the statement, Defendant crossed out the words "dick head". Defendant initialed his acknowledgement that he had been given time to read over and make any corrections to the statement and signed each of the four (4) pages.

34. Commonwealth C-1 is a copy of the Constitutional Rights form and the statement taken from Defendant by Detective Schurr and Detective Angelucci on August 12, 2014, marked, identified and admitted without objection.

35. Detective Schurr had not realized that Defendant had written "no" to the two questions on the Constitutional Rights form when Defendant gave his statement.

36. Detective Schurr explained that Defendant had answered verbally that he understood his rights and that, yes, he wanted to speak with the detectives.

37. Detective Schurr believed Defendant's verbal answers based upon Defendant's casual, relaxed demeanor and Defendant had given the detective no reason to doubt Defendant's verbal answers.

5

## CONCLUSIONS OF LAW

1. When a defendant files a motion to suppress, the burden is on the Commonwealth to demonstrate by a preponderance of the evidence that the challenged evidence was properly obtained. Pa.R.Crim.P. 581; *Commonwealth v. Galendez*, 27 A.3d 1042, 1046 (Pa.Super. 2011) *(en banc)*.

2. As it relates to this case, the Commonwealth bears the burden of proving by a preponderance of the evidence that a defendant's statement or confession is voluntary. *Commonwealth v. Harrell*, 65 A.3d 420, 434 (Pa.Super. 2013) (citing *Commonwealth v. Nester*, 551 Pa. 157, 162-63, 709 A.2d 879, 882 (1998).

3. When ruling on a suppression motion, the suppression court is required to make findings of fact and conclusions of law as to whether evidence was obtained in violation of a defendant's constitutional rights and must determine whether the Commonwealth has established by a preponderance of the evidence that the challenged evidence is admissible. Pa.R.Crim.P. 581; *Commonwealth v. Davis*, 491 Pa. 363, 368, 421 A.2d 179, 181 (1980).

4. "[I]t is within the suppression court's sole province as fact finder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Baker*, 24 A.3d 1006, 1015 (Pa.Super. 2011); *accord Commonwealth v. Simmen*, 58 A.3d 811, 817 (Pa.Super. 2012).

5. In *Commonwealth v. Lyons*, 622 Pa. 91, 79 A.3d 1053, *cert. denied sub nom. Lyons v. Pennsylvania*, 134 S.Ct. 1792, 188 L.Ed.2d 761 (2014), the Pennsylvania Supreme Court recently explained:

6

As a general rule, because of the inherently coercive nature of police custodial interrogation, statements elicited from an accused in that environment are inadmissible unless the accused was informed of and, *inter alia*, voluntarily waived his privilege against self-incrimination and the right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 471-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. DeJesus*, 567 Pa. 415, 428-30, 787 A.2d 394, 401-03 (2001). Waiver is made voluntarily if the decision to make it is the product of a free and unconstrained choice.

622 Pa. at 114, 79 A.3d at 1066.

6. The *Lyons* Court continued:

In determining whether a waiver is valid, a suppression court looks to the totality of the circumstances surrounding the waiver, including but not limited to the declarant's physical and psychological state, the attitude exhibited by the police during the interrogation, and any other factors which may serve to drain one's powers of resistance to suggestion and coercion. *DeJesus*, 567 Pa. at 429-30, 787 A.2d at 402-03.

*Id.*

7. The Pennsylvania Supreme Court has also instructed that the totality of the circumstances must be considered in evaluating the voluntariness of a confession.

The determination of whether a defendant has validly waived his *Miranda* rights depends upon a two-prong analysis: (1) whether the waiver was voluntary, in the sense that defendant's choice was not the end result of governmental pressure, and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice.

*Commonwealth v. Mitchell*, 588 Pa. 19, 53-54, 902 A.2d 430, 451 (2006).

8. Finally, in *Commonwealth v. Templin*, 568 Pa. 306, 795 A.2d 959 (2002), addressing the voluntariness of the waiver prior to the defendant's statement in that case, the Pennsylvania Supreme Court reasoned as follows:

7

In determining voluntariness, the question "is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." *Nester*, 551 Pa. at 163, 709 A.2d at 882; *Jones*, 457 Pa. at 430, 322 A.2d at 124 (same); *see also Miller*, 796 F.2d at 604 ("The question in each case is whether the defendant's will was overborne when he confessed"). "By the same token, the law does not require the coddling of those accused of crime. One such need not be protected against his own innate desire to unburden himself."

*Id.* at 317, 795 A.2d at 966.

9. Defendant asserts that his statement must be suppressed because it was not voluntarily given.

10. Specifically, Defendant proffers that the statement was involuntary as a result of police coercion and without adequate Miranda warnings or voluntary waiver of said warnings.

11. Defendant verbally acknowledged his rights as advised by Detective Schurr as read from the waiver form.

12. Defendant reviewed and signed the waiver form.

13. Although Defendant wrote down the answer "no" to the two (2) questions regarding whether he understood his rights and was still willing to speak with the detectives, Defendant verbally answered "yes" to both questions.

14. His verbal affirmative responses were recorded by Detective Angelucci to the same two (2) questions on page one (1) of the statement.

15. Defendant voluntarily agreed to give a statement.

16. In view of the totality of the circumstances surrounding the waiver, this Court concludes that Defendant voluntarily waived his rights to remain

8

silent, to speak with an attorney before continuing with the questioning and to refuse to answer any questions.

17. These circumstances include the following facts:

A. Defendant was twenty (20) years old on August 12, 2014;

B. Defendant had graduated from high school and attended some college at Valley Forge Military College;

C. Defendant displayed no indicia of impairment;

D. Defendant verbally answered the questions regarding his Constitutional Rights and the waiver of those rights in the affirmative;

E. Defendant was lucid, spoke coherently and in a relaxed, conversational manner;

F. Defendant's responses to questions were appropriate and detailed;

G. Detective Schurr wore khakis and a shirt and no badge;

H. Neither detective had a visible weapon;

I. The demeanor of Defendant and the detectives remained relaxed and conversational throughout;

J. At no time did Defendant ask to speak with an attorney;

K. At no time did Defendant refuse to answer a question and ask that the interview stop; and

L. Defendant reviewed the statement, made corrections and signed each page.

9

18. This Court found Detective Schurr's testimony to be credible, including the reason he gave for not noticing that Defendant had written "no" on the Constitutional Rights form was because Defendant had verbally responded "yes" that he understood his rights and wished to proceed.

19. In addition, on page four (4) of the statement, Defendant acknowledged that the detectives had not threatened or coerced his statement in any way.

20. Hence, Defendant voluntarily waived his Constitutional Rights under *Miranda* and that waiver is valid.

21. Having considered the totality of the circumstances surrounding Defendant's statement, the Undersigned opines that Defendant made his statement voluntarily, and that it was the product of free and unconstrained choice.

22. An appropriate Order follows.

BY THE COURT:

THOMAS P. ROGERS, J.

Copies sent on 06/30/15 to:
**By E-Mail:**
Assistant District Attorney M. Stewart Ryan
Benjamin Cooper, Esquire, Defense Counsel

Judicial Secretary

10